# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

JESSIE ENGLES,

                                        Plaintiff,

        v.                                                    9:14-CV-1185
                                                              (TJM/ATB)

BRIAN DOUGHERTY, et al.,

                                        Defendants.

JESSIE ENGLES, Plaintiff, pro se
NICOLE HAIMSON, Asst. Attorney General for Defendants

ANDREW T. BAXTER
United States Magistrate Judge

# REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge.  On October 7, 2015, Senior Judge McAvoy reviewed plaintiff's amended complaint and dismissed many of the claims, while allowing others to go forward. (Dkt. No. 32)  The remaining issues in this amended civil rights complaint are plaintiff's claims of excessive force against defendants Corrections Officer ("CO") Siriano, CO Barber, CO Rugari, CO Wiggins, and CO Murphy, failure to protect against CO Rugari, and denial of constitutionally adequate medical care against defendants Nurse Dougherty and Nurse Sypolt. (Dkt. No. 32 at 12; Amended Complaint ("AC") (Dkt. No. 26)).

Presently before the court is a motion for partial summary judgment filed by defendants Siriano, Rugari, and Dougherty. (Dkt. No. 66)  Plaintiff has not responded to the motion.  For the following reasons, this court agrees with defendants and will

recommend granting the partial motion for summary judgment.

## I.    <u>Relevant Facts</u>

Plaintiff claims that on October 6, 2011, defendants Siriano and Barber[1] used excessive force by intentionally pulling plaintiff's hand through the "feed up" port by his handcuffs, trying to break plaintiff's hands. (AC ¶ 19).  Plaintiff alleges that he sustained bruises and swelling. (*Id.*)  On October 7, 2011, plaintiff alleges that defendants Rugari and Wiggins[2] "coerced" another patient to assault plaintiff. (*Id.*) Plaintiff claims that defendants Rugari and Wiggins offered to "compensate" the other inmate with food, pornographic magazines, and tobacco.  The defendants allegedly opened both cells at the same time "in an attempt to facilitate" the assault. (*Id.*)

Plaintiff claims that on October 13, 2011, defendant Rugari began harassing plaintiff verbally, causing plaintiff to suffer excruciating chest pain. (AC ¶ 20). Defendant Rugari then coerced defendant Dougherty into fabricating medical reports. (*Id.*)  Plaintiff claims that he was also punched, hit, and assaulted by defendants Rugari and Murphy[3] in front of defendant Dougherty for refusing to leave the medical clinic until he spoke to a sergeant. (*Id.*)  Plaintiff alleges that no "use of force" photo was taken, and defendant Dougherty failed to properly treat plaintiff for the head and hand injuries that he sustained as a result of the alleged assault. (*Id.*)

---

[1] Defendant Barber has not been served in this action and has not joined in the summary judgment motion.  The court will discuss the unserved defendants below.

[2] Defendant Wiggins also has not been served in this action and thus, has not joined in the summary judgment motion.

[3] Defendants Rugari and Murphy are not moving for summary judgment on the October 13, 2011 excessive force claim.

Defendants have supported their motion for partial summary judgment with many documents, including a copy of plaintiff's June 3, 2016 deposition. (Dkt. Nos. 66-1, 66-4-66-8). Relevant details of the evidence in the record are discussed further below in the course of analyzing the issues raised in the defendants' motion.

## II.   <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining

whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

### III.    **Exhaustion of Administrative Remedies**

####    A.    **Legal Standards**

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion

4

means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court.  548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC").  N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility.  *Id*. § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC").  *Id*. § 701.5(d).  The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance."  *Id.* § 701.3(a) (Inmate's Responsibility).  There is also a special section for complaints of harassment.  *Id*. § 701.8.  Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (i), 701.5.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies.  *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004).  The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own

actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016). "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See also Riles*, 2016 WL 4572321 at *2.

## B. Application

Defendants argue that plaintiff has failed to exhaust his claim that defendants Siriano and Barber used excessive force against plaintiff on October 6, 2011 when they allegedly pulled his hands through the feed-up port in plaintiff's cell while plaintiff was handcuffed. (Def.s' Mem. at 6-11). In support of their argument, defendants have filed the declaration of Karen Bellamy, the Director of the Inmate Grievance Program ("IGP"). (Dkt. No. 66-4) (Bellamy Decl.) Director Bellamy states that she is the

custodian of records maintained by the CORC. (Bellamy Decl. ¶ 3).  Director Bellamy also states that an inmate's claim of excessive force is a proper subject to raise in a grievance. (Bellamy Decl. ¶ 10).  Director Bellamy further states that Department of Corrections and Community Services ("DOCCS") records indicate that plaintiff was incarcerated at Marcy Correctional Facility ("Marcy") at the time of the alleged incident in October 2011 until July 27, 2012. (Bellamy Decl. ¶ 12).  During that time, Marcy had a "fully functioning inmate grievance process," to which all inmates have full access. (*Id.*)

DOCCS records reflect that following the alleged excessive force incident on October 6, 2011, plaintiff filed three grievance appeals (MCY-15701; MCY-15770; and MCY-15867), none of which related to an alleged use of force by defendants Siriano or Barber on October 6, 2011. (Bellamy Decl. ¶¶ 13-14).  Plaintiff filed MCY-15701 on October 21, 2011. (Bellamy Decl. Ex. A at CM/ECF p.4).  Although Director Bellamy's list of grievance appeals states that MCY-15770 involved excessive force, plaintiff was shown the actual grievance document at his deposition, and he testified that the grievance related to the October 13, 2011 alleged excessive force incident. (Haimson Decl. Ex. A) (Dkt. No. 66-7) (Pl.'s Dep. at 60).  There was no grievance appeal relating to the October 6, 2011 incident.  Thus, it is not disputed that plaintiff failed to appeal any grievance regarding the October 6, 2011 alleged excessive force incident to the CORC.  The court must now examine whether the grievance procedure was "available" to the plaintiff. *Ross, supra*.

In *Ross*, the Court highlighted three instances in which administrative remedies,

7

that were "officially on the books," were not "capable of use to obtain relief." *Ross*, 136

S. Ct. at 1859-60). The Second Circuit has discussed these circumstances and has held

that administrative remedies can be considered "unavailable" if the remedy (1)

"'operates as a simple dead end - with officers unable or consistently unwilling to

provide any relief to aggrieved inmates;'" (2) the "'administrative scheme may be so

opaque that it becomes, practically speaking, incapable of use,'" and (3) the

administrative remedy may be unavailable "'when prison administrators thwart inmates

from taking advantage of a grievance process through machination, misrepresentation,

or intimidation.'" *Williams v. Priatno*, 829 F.3d 118, 123-24 (2d Cir. 2016) (quoting

*Ross*, 136 S. Ct. at 1859-60). This determination is ultimately a question of law to be

determined by the court, even when it contains factual elements. *Hubbs v. Suffolk*

*County Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted).

 In this case, the grievance process was certainly "on the books" as stated above.

In addition, plaintiff was quite familiar with the process and had used it many times,

both prior to the October 6, 2011 incident, and after the incident. (Bellamy Decl. Ex.

A). At his deposition, after acknowledging that the grievance he filed on October 21,

2011 did not involve the October 6, 2011 incident, he testified that he filed a "separate

grievance" for the October 6, 2011 incident. (Pl.'s Dep. at 61). However, there is no

evidence of a "separate" grievance being filed, and plaintiff was unclear about the

details of such a grievance.

 Plaintiff's October 25, 2011 grievance was about "mail tampering." (Bellamy

Decl. Ex. A at ; Pl.'s Dep. at 63-64). Plaintiff testified at his deposition that he was

aware that if he did not receive a response to his grievances within the statutory time limit, he could appeal the grievance to the next level. (Pl.'s Dep. at 64-65). Plaintiff then stated that he did not have a copy of the alleged grievance relating to the October 6th incident, but that he had "proof" that "they" were threatening and harassing plaintiff, and telling him not to file grievances. (Pl.'s Dep. at 65). Plaintiff discussed the "mail tampering grievance," but conceded that his failure to obtain a response to an alleged October 6, 2011 excessive force grievance was not mentioned in the "mail tampering grievance." (Pl.'s Dep. at 66-67). Then plaintiff testified that "officers" were going out of their way to not process plaintiff's grievances. (Pl.'s Dep. at 70). However, plaintiff never identified any officer who allegedly failed to process plaintiff's grievances.

Defense counsel asked plaintiff how he could claim that his mail or grievances were being tampered with, when the grievance complaining about excessive force that occurred on October 13, 2011 was processed all the way to the CORC. (Pl.'s Dep. at 71-72). Plaintiff then claimed that there were another five grievances that did not get processed, but never specified the subject of those alleged grievances. (Pl.'s Dep. at 72-73). However, plaintiff testified that he was sure that neither defendant Siriano nor Barber was the individual who tampered with plaintiff's mail. (Pl.'s Dep. at 76-77). Plaintiff also stated that he never had trouble with either of these two defendants again. (Pl.'s Dep. at 77). Plaintiff did not really explain why the officers would let one excessive force grievance go through, while not processing another, particularly when the October 13, 2011 incident was more serious.

In another attempt to support his argument that someone may have tampered with

grievance regarding the October 6th incident, plaintiff testified that his sister might have a copy of the grievance regarding the October 6th incident. Plaintiff claimed that he was in the habit of sending her copies of his grievances, "just in case they destroy [them], [or] tamper [with them]." (Pl.'s Dep. at 54-55, 62). Notwithstanding this statement, plaintiff never provided defendants with a copy of the alleged grievance, even though plaintiff provided a substantial number of other documents to defendants in discovery. (Haimson Decl. Exs. C & D) (Letters from plaintiff regarding discovery documents) (Dkt. No. 66-8 at 7-8. 10).

On June 27, 2016, plaintiff wrote to defense counsel, referenced the deposition, and stated that he was forwarding 125 pages of "legal documents," however, the documents that he allegedly sent to his sister were not among them. (*Id.* Ex. C at 1). Plaintiff stated in the letter that his sister was angry with him, and that he had lost contact with her. On February 6, 2017, plaintiff wrote to defense counsel, enclosing 60 more pages of discovery documents. However, the alleged grievance was not among the 60 additional pages provided. (*Id.* Ex. D). Thus, the alleged grievance regarding the October 6th incident was never forwarded to defense counsel.

Defendants have shown that there is no record of plaintiff appealing a grievance regarding the October 6, 2011 incident to the CORC, notwithstanding three other grievances that were filed close to the same time period and appealed at every administrative level. Plaintiff's statement that he filed a "separate grievance," but it was somehow lost or destroyed, is not supported by anything but inconsistent assertions. Plaintiff specifically testified that neither defendant Siriano nor defendant

Barber interfered with plaintiff's mail, and he never had a problem with either defendant after October 6, 2011.  The court also notes that plaintiff's October 26, 2011 grievance complained of "mail being tampered with," but failed to mention that the grievance committee had failed to acknowledge receipt of the alleged October 6th grievance.  Plaintiff filed and appealed another grievance, complaining of threats by an officer on December 27, 2011, and on January 10, 2012, he filed and appealed another grievance complaining about his finger being slammed in the cell shield. (Bellamy Ex. A at CM/ECF p.4).

Plaintiff has not responded to the summary judgment motion, and it defies logic to hold that administrative remedies were not "available" to plaintiff, given the evidence in the record.  The mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient. *New York v. United Parcel Svc.*, 179 F. Supp. 282, 292 (S.D.N.Y. 2016) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)).  There must be some evidence on which the fact finder[4] could reasonably find for the plaintiff. *Id.*  The court in *Jeffreys* stated that in those "rare circumstances where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may weigh the credibility of plaintiff's "version" of the events in determining whether to grant summary judgment. 426 F.3d at 554.

In this case, there is no basis to credit plaintiff's assertion that he filed a

---

[4] Generally, the fact finder is the jury. *See Jeffreys, supra.*  However, as stated above, exhaustion is ultimately a question of law for the court to determine, even if the resolution of some facts is necessary.

grievance that was intentionally destroyed or tampered with by unknown corrections officers, particularly when his later grievance about mail tampering did not include a discussion of any grievance regarding the October 6th incident and given the fact that so many other grievances did make it to the CORC.  Plaintiff was also not clear that he actually sent a copy of the grievance to his sister.  He merely speculated that he did so because he often sent her copies of documents.  In addition, after plaintiff's deposition, although he provided defendants with additional documents, the alleged grievance was not among them.  Coupled with the fact that plaintiff filed several grievances that were properly appealed and processed during that time period, plaintiff's allegation that the grievance was not mailed, or was destroyed, by unknown corrections officers is speculative at best.[5]

---

[5] The court notes that in *Williams v. Priatno, supra*, the Second Circuit reversed the district court's dismissal for failure to state a claim on the basis of failure to exhaust when the plaintiff alleged that his grievance was never filed.  The district court reasoned that even if Williams's grievance had never been filed, he still could have appealed it to the next level because "the regulations allow an appeal in the absence of a response." 829 F.3d at 121.  However, the Second Circuit found that, even though the administrative remedy was "on the books," they gave no guidance "to an inmate whose grievance was never filed." *Id.* at 124.  Because the defendant's motion was one to dismiss for failure to state a claim, the court accepted "as true Williams's allegation that the corrections officer never filed his grievance." *Id.*  The court held that the appeal process was "unavailable" because the procedure was "prohibitively opaque" so that "no inmate could actually make use of it." *Id.* at 126.  The plaintiff's problem with the administrative remedy procedure in *Williams* was compounded because the plaintiff was transferred to another facility before he could utilize the appeal procedure.  This case is distinguishable from *Williams*.  First, the defendants have moved for summary judgment, and the court has the benefit being able to consider additional documents, including the plaintiff's deposition.  Plaintiff remained at the same facility the entire time.  Plaintiff was well aware of the procedure, and based on his ability to file and appeal multiple grievances before and after the October 6th incident, it is apparent that he may never have attempted to file, or forgot to file, the grievance regarding the October 6th incident.  In a footnote, the court in *Williams* stated that defendants bear the burden of establishing the affirmative defense of failure to exhaust, and had not done so in *Williams*. 829 F.3d at 126 n.6.  In this case because the defendants have moved for summary judgment, they have met their burden of showing failure to exhaust, and plaintiff has not responded with any coherent evidence showing otherwise.

Thus, this court finds that plaintiff has not exhausted his administrative remedies regarding the incident involving defendants Siriano and Barber on October 6, 2011.  In addition, plaintiff has failed to show that the grievance procedure was "unavailable" to him in any of the ways described in *Ross*. *See Nelson v. Artus*, No. 14-CV-6634, 2016 WL 1023324, at *2-3 (W.D.N.Y. Mar. 8, 2016) (a pre-*Ross* case, holding that inmate's civil rights action could not withstand a motion for summary judgment because plaintiff failed to provide a copy of a grievance appeal referenced in his complaint, and defendant submitted affidavits from a prison official who had unsuccessfully searched prison records for a copy of the grievance appeal in question). *See also Chambers v. Johnpierre*, No. 3:14-CV-1802, 2016 WL 5745083, at *7 (D. Conn. Sept. 30, 2016) (plaintiff's unsupported statements that he filed grievances and grievance appeals . . . do not create an issue of fact with regard to the exhaustion of his claims) (citing *Jeffreys, supra* and *Nelson, supra*).  Plaintiff's first cause of action may be dismissed for failure to exhaust administrative remedies.[6]

## IV.     Failure to Protect

### A.     Legal Standards

In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk

---

[6] The court notes that defendants also argue that, even though plaintiff did not exhaust his administrative remedies, this claim fails on the merits.  This court need not address the merits of plaintiff's Eighth Amendment claim regarding the October 6, 2011 incident because plaintiff has failed to exhaust his administrative remedies.  Although defendant Barber has not been served and has not joined in the motion for partial summary judgment, the court must recommend dismissal as against defendant Barber with respect to the October 6, 2011 incident because even if defendant Barber had been served or is subsequently served, there is no way that this claim could be asserted against him, given plaintiff's failure to exhaust his administrative remedies.

of serious harm, **and** prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The plaintiff must show that prison officials ***actually knew of and disregarded*** an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and the defendant must also draw that inference. *Id.*

### B.    Application

Plaintiff claims that on October 7, 2011, defendant Rugari and defendant Wiggins "coerced" another inmate - Inmate Fox - into assaulting plaintiff in exchange for food, magazines, and tobacco. (AC ¶ 19). Plaintiff claims that the defendants opened both plaintiff's and Fox's cell at the same time in order to facilitate the assault. (*Id.*) The amended complaint contains no further details of the incident. However, at his deposition, plaintiff testified that inmate Fox never assaulted him. (Pl.'s Dep. at 83-84). Plaintiff then stated that "the attempt was there." (Pl.'s Dep. at 84). Plaintiff testified that Fox told him "afterwards" that the officers had tried to talk Fox into assaulting plaintiff. (Pl.'s Dep. at 95). Plaintiff stated that, when the cell doors were opened, he walked out of his cell and walked right by inmate Fox, who only looked at plaintiff and said "oh, shit, he really did it."[7] (Pl.'s Dep. at 99). However, nothing violent happened between the two inmates. (Pl.'s Dep. at 100).

Plaintiff then testified that took the opportunity to misbehave while released from his cell, stealing an officer's shield and helmet and smashing "feed up patches." (Pl.'s

---

[7] Plaintiff implied that Fox was commenting on the fact that the officer actually let both inmates out of their cells at the same time, expecting Fox to assault plaintiff.

14

Dep. at 102-103, 109).  Plaintiff testified that Fox gave him "some positive advice and feedback," in an effort to convince plaintiff to return to his cell. (Pl.'s Dep. at 104). Plaintiff testified that he was later told that the two cells opened at the same time due to a malfunction or "mechanical failure." (Pl.'s Dep. at 107).  Plaintiff received various misbehavior charges as a result of the incident, but there was no assault on plaintiff by inmate Fox.  Thus, neither defendant may be liable for failure to protect because there was no incident, and consequently no injury.[8] *See Encarnacion v. Dann*, 80 F. App'x 140, 141 (2d Cir. 2003) (affirming summary judgment for defendants because plaintiff suffered no injury from defendants' "failure to protect" him from another inmate). Plaintiff's second cause of action may be dismissed as against defendants Rugari[9] and Wiggins.[10]

## V.    Denial of Medical Care

### A.    Legal Standards

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316

---

[8] The basis for plaintiff's claim appears to be that Inmate Fox told plaintiff "later" that the officers asked Fox to assault plaintiff.  This evidence is hearsay, at best.

[9] Defendant Rugari is not moving for summary judgment on the alleged October 13, 2011 assault.  Thus, only the failure to protect claim should be dismissed as against this defendant.

[10] As stated above, the court is aware that defendant Wiggins has not been served and has not joined in the motion for summary judgment.  However, the court will recommend dismissing plaintiff's second cause of action sua sponte as against defendant Wiggins because it is clear that plaintiff fails to state a claim.

F.3d 178, 183–84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind.  *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### a.    Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious."  *Salahuddin*, 467 F.3d at 279 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Determining whether a deprivation is sufficiently serious also involves two inquiries.  *Id.*  The first question is whether the plaintiff was actually deprived of adequate medical care.  *Id.*  Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care."  *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious."  *Id.* at 280.  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff.  *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)).  If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious."  *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003)).  However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower.  *Id.*  If the issue is an unreasonable delay or interruption of ongoing

treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185). The court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### b.    Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer*, 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was

"insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Plaintiff's preference for an alternative treatment or belief that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.; see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

## B.    Application

Plaintiff claims that on October 13, 2011, he was the victim of an assault by

defendant Rugari and Murphy.[11]  Apparently, defendant Rugari had been harassing plaintiff all day, to the point where plaintiff experienced chest pain. (AC ¶ 20). Defendant Rugari then allegedly exercised "undue influence" over defendant Dougherty in an effort to have Dougherty falsify and "fabricate" medical records relating to the alleged assault. (AC ¶ 20).  Plaintiff also claims that defendant Rugari assaulted plaintiff a second time in front of defendant Dougherty, who then failed to take a "use of force photo" or treat plaintiff for the head and hand injuries that plaintiff sustained from the alleged assault.[12]

At his deposition, plaintiff claimed that he suffered bruising, swelling at the wrist, a bleeding and "busted" lip, and a laceration, swelling, and bruising to his head. (Pl.'s Dep. at 161, 165-67, 170-72).  The bruising and swelling of plaintiff's head lasted "a couple days." (Pl.'s Dep. at 167).  At the deposition, plaintiff claimed for the first time that he lost consciousness briefly. (Pl.'s Dep. at 168).  Plaintiff also testified that after the incident, both of his hands were swollen, and he could not move the fingers on his right hand. (Pl.'s Dep. at 172).

Plaintiff testified that defendant Dougherty was deliberately indifferent to plaintiff's serious medical needs because he did not come to see or evaluate plaintiff after the incident, and later,[13] he refused to order x-rays, even though plaintiff requested

---

[11] As stated above, defendants are not moving for summary judgment on the alleged excessive force related to the October 13, 2011 incident.

[12] The language of the amended complaint implies that the "assault" occurred when plaintiff refused to leave the medical clinic until he spoke to a sergeant. (AC ¶ 20).

[13] Plaintiff stated that after the incident, he "continued to complain via the sick call." (Pl.'s Dep. at 175).

to be sent to an outside hospital for x-rays. (Pl.'s Dep. at 175).  Plaintiff speculated that defendants did not want the x-rays taken so that plaintiff would be unable to prove that his hand was broken. (*Id.*)

Plaintiff then described more of the facts surrounding the incident. (Pl.'s Dep. at 180).  Plaintiff stated that he was taken to the clinic because he had "cardio arrest." (*Id.*) Plaintiff then states that "they" took an EKG while he was at the clinic, and that was the only "medical observation" made by defendant Dougherty at that time. (*Id.*)  Plaintiff asked to go to an outside hospital for his cardiac problem, and defendant Dougherty allegedly "relying on the officer," refused to send plaintiff to an outside hospital. Plaintiff states that, because of this refusal, he "became mad and said [he] wanted to speak to a sergeant." (*Id.*)  Plaintiff's testimony then becomes very difficult to understand.  However, defendants have filed the "Use of Force" report from the October 13, 2011 incident which explains their version of the incident. (Def.s' Ex. E) (Dkt. No. 66-8 at 13-15).

The Use of Force report indicates that on October 13, 2011, plaintiff was in the infirmary, and he "was sitting up on the infirmary bed when he jumped off the bed and charged at Officer Murphy in an aggressive manner."[14] (*Id.* at 13).  The report states that defendant Murphy wrapped his arms around plaintiff's torso area, and defendant Rugari wrapped his arms around plaintiff's upper body area. (*Id.*)  Together, the

---

[14] Although defendant Rugari is not moving for summary judgment on the alleged excessive force used during this incident, the facts are relevant to plaintiff's alleged treatment, or lack thereof, by defendant Dougherty.

officers pulled plaintiff to the ground.  Officer Fonner[15] held both of plaintiff's ankles and applied leg restraints.  (*Id.*)  Officer Fonner picked plaintiff up from behind both knees, Officer Murphy lifted plaintiff by his right arm, while Officer Rugari lifted him by his left arm.  Plaintiff was carried to the examination table and placed on his left side.  Once plaintiff was on the table, Officer Fonner released his hold and moved his left hand down to hold the leg iron chain.  Defendant Murphy took control of plaintiff's handcuffs with his right hand.  Officer Rugari used both of his hands to press on plaintiff's left shoulder to control him on the examination table.  Plaintiff stopped resisting and was taken to the RCTP Strip Frisk room to be admitted to RCTP at the direction of Nurse Stanowski.

During the escort, defendant Murphy maintained control of plaintiff's waist chain by holding it with his right hand.  Plaintiff was strip frisked, and as the frisk was completed, defendant Murphy ordered plaintiff to place his left hand behind his back to be handcuffed.  However, plaintiff refused, so defendant Murphy placed the handcuff on plaintiff's wrist while plaintiff's hand was still up on the wall.  Plaintiff became combative again, and defendant Murphy took control of plaintiff's left arm with Murphy's left hand and took control of plaintiff's right shoulder with Murphy's right hand.  Officer Rugari used downward pressure on both of plaintiff's shoulders to take him to the floor.  Plaintiff continued to struggle while he was on the floor, but defendant Murphy retained control of plaintiff's right arm.  Officer Fonner also gained

---

[15] There are two separate incidents which occurred on October 13, 2011 in the infirmary. Plaintiff was subdued once, and then he became combative again.  There were other officers involved in both instances, but only Officers Rugari and Murphy have been named as defendants. (Def.s' Ex. E).

control of plaintiff's right arm using both hands, and Officer Leone applied leg restraints.  Officer Leone also assisted in getting plaintiff's hands behind his back to be handcuffed.  Officer Crandall also assisted in getting plaintiff's hands behind his back, while defendant Rugari applied the handcuffs. (*Id.* at 14).

Plaintiff stopped resisting after the handcuffs were applied.  Plaintiff was then assisted to his feet and escorted to a cell without further incident.  The Use of Force report indicates that Nurse Dougherty went to the cell, but "Inmate Engle [sic] again refused to be assessed or treated.  No injuries were visually noted by Nurse Dougherty." (*Id.*)  The report states that a ½ inch laceration was noted on plaintiff's left wrist, and plaintiff stated that his left pinky finger was sore.  No swelling was noted.  The report states that "Inmate refused treatment and further assessment." (*Id.* at 15).  Finally, the report indicates that plaintiff refused any "use of force photos." (*Id.*)

Plaintiff testified that defendant Dougherty did not assess him for injuries on October 13, 2011, even though the "Use of Force Report" noted such assessment and noted that plaintiff refused further evaluation. (Pl.'s Dep. at 192).  Plaintiff testified that defendant Dougherty was only present "in the clinic," that "this all happened after that," and that plaintiff never saw Dougherty again. (Pl.'s Dep. at 193).  Plaintiff claimed at his deposition that defendant Dougherty "falsified" the report and was instead noting plaintiff's hand and wrist injuries from October 6, 2011. (Pl.'s Dep. at 185-86, 190-91).

Plaintiff then testified that after he was admitted to the observation unit "an RMH

nurse did come around,"[16] but it was not defendant Dougherty. (Pl.'s Dep. at 194).

Plaintiff testified that the RMH nurse came around "within a one-hour range." (Pl.'s

Dep. at 195-96). Plaintiff testified that the RMH nurse was not "qualified" to assess his

physical injuries.[17] (Pl.'s Dep. at 197). Plaintiff claims that the RMH nurse did see his

"busted" lip, but accused plaintiff of provoking the officers. (*Id.*) Plaintiff testified that

he said "Yeah, but that still don't [sic] justify what they did to me." (*Id.*) Plaintiff

stated that the RMH nurse only gave plaintiff his regular medication, nothing for the

pain, and that defendant Dougherty "was supposed to do that," but he "never came back

around." (Pl.'s Dep. at 198).

     Plaintiff then made accusations about defendant Dougherty that were unrelated to

the incident and also testified that he did complain to the RMH nurses, but one of them

"covered up" for Dougherty, and "[i]nstead of providing me, they ignored me." (Pl.'s

Dep. at 199). Plaintiff agreed that he had "other options" of receiving medical care.

(Pl.'s Dep. at 200). Plaintiff stated that he requested sick call every day, but was never

treated for his "injuries." (Pl.'s Dep. at 202). Plaintiff stated that he wanted an x-ray for

his hand, but that he was denied such x-ray, even though the medical records indicated

on November 2, 2011 that he refused an x-ray. (Pl.'s Dep. at 204-205). Plaintiff stated

that all the medical records, indicating that he refused x-rays were for "the most part,"

false or "half truths." (Pl.'s Dep. at 205).

---

[16] RMH stands for Residential Mental Health.

[17] Plaintiff was attempting to distinguish defendant Dougherty, who was allegedly a "medical nurse," responsible for an inmate's *physical* condition, with the RMH nurse who would only be responsible for an inmate's *mental* status. (Pl.'s Dep. at 194, 197).

Plaintiff's testimony is inconsistent with respect to defendant Dougherty's alleged conduct.  Plaintiff testified that the injuries he sustained on October 13, 2011 that required medical care were not sustained when the defendants used force in the clinic in front of defendant Dougherty.  Rather, the relevant injuries occurred when plaintiff was taken to the observation cell for admission. (Pl.'s Dep. at 193).  Plaintiff then claims that defendant Dougherty was deliberately indifferent for failing to address the injuries that he did not witness.[18]  Plaintiff claims that defendant Dougherty should have "come around" later, but then states that he saw an RMH nurse within an hour of the incident.[19] (Pl.'s Dep. at 193).  Plaintiff attempts to avoid the problem by stating that the RMH nurse was not "authorized" to help him, order x-rays, or give him anything but his "regular medication." (Pl.'s Dep. at 197-98).  Plaintiff stated that the RMH nurse did give plaintiff his "regular prescribed RMH medication," but nothing for his pain because "Dougherty was supposed to do that.  He never came back around." (Pl.'s Dep. at 198).

Defendants first argue that, even crediting plaintiff's version of his injuries, the injuries were not sufficiently serious to meet the objective prong of the constitutional test.  Plaintiff alleges that his left hand/wrist and two fingers were "broken" and that his

---

[18] The testimony was as follows:

    Q.    So when this was happening, you're getting assaulted right in front of him, he doesn't come to you, is that what you're saying?

    A.    Dougherty was only present for a minute I was in the clinic and this all happened there after that.  I didn't see him again.

(Pl.'s Dep. at 193).

[19] The records indicate that defendant Dougherty did go back to see plaintiff after the incident in the strip search area, and that plaintiff refused examination or treatment, so defendant Dougherty only noted the visible injuries which were minor.

lip was "busted."  The minor lacerations and split lip do not rise to the level of sufficiently serious injuries. *See Dallio v. Herbert*, 678 F. Supp. 35, 44 (N.D.N.Y. 2009) (citing inter alia *Benitez v. Straley*, No. 01-CV-181, 2006 WL 5400078, at *3, 4, 12 (S.D.N.Y. Feb. 16, 2006) (cut on plaintiff's lips, cut on plaintiff's head, and "severe cuts" to plaintiff's wrists-none of which required stitches-did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment, even if plaintiff's allegations were assumed to be true)).

However, in *Lester v. Mancini*, No. 07 Civ. 8265, 2013 WL 5405468, at *20 (S.D.N.Y. Sept. 25, 2013) the court stated that it could not "say as a matter of law that a broken hand, with attendant pain, does not constitute a sufficiently serious injury for Eighth Amendment purposes." *Id.* (citing *Benning v. Ehrits*, No. 9:08-CV-815, 2009 WL 2982973, at *4 (N.D.N.Y. Sept. 14, 2009) (citing *Bryan v. Endell*, 141 F.3d 1290, 1293 (8th Cir.1998) (finding a broken hand a serious medical condition)); *Mendez v. Acting Sheriff, Nassau Ctny. Corr. Ctr.*, No. 10-CV-1960, 2010 WL 2629781, at *2 (E.D.N.Y. June 28, 2010) (same)).  Although there is no indication in this case that plaintiff's hand, wrist, or fingers were actually broken, the court will assume that plaintiff had a serious medical need and proceed to the subjective prong of the Eighth Amendment analysis.

Although plaintiff argues that defendant Dougherty refused to treat him after the October 13, 2011 use of force, the documents produced by defendants show otherwise. The Use of Force Report states that plaintiff refused use of force photographs and treatment.  After the second time that plaintiff became combative, the Use of Force

25

Report states that "Nurse Dougherty then went to the cell and Inmate Engle [sic] again refused to be assessed or treated." (Def.s' Ex. E at 14).  Plaintiff was shown additional documents at his deposition, indicating that defendant Dougherty did attempt to treat plaintiff, but plaintiff claimed at his deposition that all those documents were false. (Pl.'s Dep. at 206-207, 232 (use of force report)).  There were some documents that plaintiff stated were half true and half false. (*Id.*)

Plaintiff testified that his "main gripe" was that an x-ray was not ordered quickly enough. (Pl.'s Dep. at 208).  However, plaintiff stated that they were "trying to avoid [ordering an x-ray]," but that "it actually did get ordered."[20] (*Id.* at 209).  In addition, plaintiff's testimony at his deposition was so inconsistent that it is unclear what he believes that defendant Dougherty did after the incident or what defendant Dougherty witnessed.  Plaintiff's conclusory allegation that the medical professionals and other officers "covered up," and fabricated plaintiff's medical records and log books to suppress evidence of his alleged injuries (Pl.'s Dep. at 205-207) is highly suspect and would, in this court's view, also be insufficient to sway any rational fact finder.  *See, e.g.*, *Benitez v. Mailloux*, No. 9:05-CV-1160, 2009 WL 1953847, at *8 (N.D.N.Y. Mar. 25, 2009) (Treece, MJ) (plaintiff's conclusory contention that defendant falsified his ambulatory health care record is not enough to withstand summary judgment on his deliberate indifference claim), *report recommendation rejected, in part, on other grounds*, 2009 WL 1953752 (N.D.N.Y. July 2, 2009) (Mordue, DJ); *Liner v. Goord*, 115 F. Supp. 2d 432, 435 (S.D.N.Y. 2000) (dismissing conclusory claims that

---

[20] The documents shown to plaintiff at the deposition indicated that an x-ray was ordered on November 2, 2011, after plaintiff complained about his hand. (Pl.'s Dep. at 215).

defendants conspired to tamper with and destroy plaintiff's medical records).[21]

Plaintiff also testified that he was examined by a mental health nurse after the incident, but did not mention his problems to her because she would not have been "authorized" to treat physical problems. This statement defies belief. If plaintiff's hand had been broken, and he was in as much pain as he states, it is highly incredible that he would not have mentioned the problem to any medical professional who spoke to him that day. Even if the nurse had not been authorized to "treat" plaintiff for his injury, he or she could certainly have reported it to another health care professional who would have been able to treat plaintiff's alleged injury.

Plaintiff testified that defendant Sypolt[22] noted plaintiff's injury, but did not order x-rays. (Pl.'s Dep. at 219). Plaintiff stated that although defendant Dougherty did not "meet" with plaintiff on October 13, he did "meet" with plaintiff three times after the incident, and before November 2, 2011. (Pl.'s Dep. at 221). Defendant Dougherty allegedly told plaintiff that he was going to be alright, and that "it" would heal in a couple of days. (*Id.* at 220-21). Plaintiff testified that defendant Dougherty saw the

---

[21] *But see Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984) (The records maintained by the prison officials and hospital do substantiate the conclusion that appellees provided Archer with comprehensive, if not doting, health care. Nonetheless, Archer's affidavit in opposition to the motion for summary judgment does raise material factual disputes, for example by alleging that defendants delayed her access to medical care at a time she was in extreme pain.); *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512-13 (N.D.N.Y.1999) (although records maintained by prison officials lend credence to [Defendant]'s version of events in that they show Plaintiff was provided with substantial medical care and treatment, Plaintiff's affidavits in support of summary judgment nonetheless raise material factual disputes, regardless of their likely resolution). In this case, however, plaintiff has not responded to defendants' motion for summary judgment, and his claims of fabrication of evidence came after plaintiff was presented with the multiple medical records which indicated that he was examined immediately after the incident and that he refused treatment on two occasions.

[22] Nurse Sypolt has not been served.

swelling and discoloration, but told plaintiff to "continue taking [his] pain killers," and that he did not "feel [plaintiff needed] x-rays." (Pl.'s Dep. at 221).  Plaintiff added that defendant Dougherty told plaintiff that if he had not been "such an asshole," he would have gotten x-rays the day of the incident. (*Id.* at 221).

Plaintiff then stated that he requested "stronger" pain medication because he was only taking Ibuprofen at the time. (Pl.'s Dep. at 222).  Plaintiff also asked for "something for [his] nerve damage for like [sic] muscle relaxers," but that defendant Dougherty "didn't feel that it was necessary."  (*Id.*)  Defendant Dougherty explained to plaintiff that what he was suffering from was "inflammatory." (*Id.*)  Plaintiff claimed that defendant Dougherty did not "put [him] in" for a doctor. (*Id.* at 223-24).  Plaintiff claimed that it was defendant Dougherty's "duty to refer [plaintiff] to a doctor who could make that assessment. (Pl.'s Dep. at 224).  As plaintiff was testifying, he began to allege that defendant Dougherty had also somehow been involved in a denial of medical care after the October 6, 2011 incident, which was not raised in the amended complaint. (Pl.'s Dep. at 225-26).  It appeared during the deposition that the only reason that plaintiff came up with the idea that defendant Dougherty should be responsible for October 6, 2011 was that he was "listed in the record of my progress note on October – according to October 6, each day I put in for sick call . . . [a]nd he was one of the nurses." (Pl.'s Dep. at 226).

Plaintiff's disagreement with the way that he was treated by defendant Dougherty does not state a constitutional violation, even if the defendant was incorrect in the assessment of plaintiff's injury.  The fact that defendant Dougherty "denied" plaintiff

medication, if defendant Dougherty believed that the stronger medication was unnecessary, does not state a constitutional claim. The more plaintiff testified, the more apparent it became that he simply disagreed with defendant Dougherty's assessment of his injury and disagreed with the treatment and medication provided. If defendant Dougherty was incorrect about plaintiff's treatment, even to the point of being negligent, negligence does not rise to the level of a constitutional violation. Thus, the plaintiff has failed to create a genuine issue of material fact with respect to his medical care claim against defendant Dougherty. Thus, plaintiff's claim that he was denied constitutionally adequate medical care by defendant Dougherty after the October 13, 2011 incident may be dismissed.[23]

## VI.    **Unserved Defendants**

### A.    **Legal Standards**

When the original complaint in this case was filed, Rule 4(m) provided that a defendant must be served with process within 120 days[24] of the filing of the complaint, unless good cause exists for the failure. Fed. R. Civ. P. 4(m). Rule 4(m) further provides that, if the summons and complaint are not served within the appropriate time, the court, on motion or on its own, "must dismiss the action without prejudice against that defendant or order that service be made within a specified time." *Id.* (current rule

---

[23] For similar reasons, plaintiff has failed to create a genuine issue of material fact with respect to defendant Sypolt.

[24] In 2015, Rule 4(m) was amended to shorten the period of time for service to 90 days after the filing of the complaint. Fed. R. Civ. P. 4(m) (advisory committee notes). However, the amendment did not take effect until December 31, 2015, and the amended complaint in this case was filed in July of 2015. The amendment of Rule 4(m) has not affected this court's decision herein.

language).  If plaintiff shows good cause for the failure to serve, then the court must extend the time for service "for an appropriate period." *Id.*

### B.    Application

Defendants Sypolt (medical care), Wiggins (failure to protect), and Barber (excessive force on October 6, 2011) have not been served in this action. (*See* Dkt. No. 28).  Attempts were made to serve "CO Barber," but the U.S. Marshal Form 285 was returned "unexecuted" on July 13, 2015, after a second attempt at personal service because the Marshal was unable to locate defendant Barber at Marcy. (Dkt. No. 28-1). Attempts were also made to serve defendant Sybolt. (Dkt. No. 28-1).  However, on July 13, 2015, the U.S. Marshal Form 285 was returned "unexecuted" as to defendant Sybolt because this defendant was no longer employed at Marcy. (Dkt. No. 28-2).  The notation on the form indicates that defendant Sybolt was "retired," and his "address [was] unknown." (*Id.*)

Defendant Wiggins was initially dismissed from the action based on the allegations in the original complaint, but then was added as a defendant after the amended complaint was filed. (Dkt. Nos. 25, 32).  Because of the sua sponte dismissal of the claims asserted in the original complaint, service was never attempted on defendant Wiggins.  When defendant Wiggins was again added as a defendant, after review of the amended complaint, the court ordered that "upon receipt from plaintiff" of the documents required for service on defendant Wiggins, "the Clerk shall (1) issue a summons and forward it, along with a copy of the amended complaint to the United

States Marshal for service upon defendant Wiggins." (Dkt. No. 32 at 13).

It does not appear that plaintiff ever complied with the court's order to provide the Clerk with the information required for service on defendant Wiggins because there is no indication that a summons was ever issued by the Clerk, and there is no indication that service was ever attempted on defendant Wiggins by the Marshal.[25]  Although, after the stay was lifted, plaintiff participated in a telephone conference with the court involving litigation over discovery, resulting in a motion to compel. (Dkt. Nos. 53-55, 57-59).  The motion to compel was granted in part, and required defendants to determine whether certain information involving defendant Wiggins, Sypolt, and Barber existed. (Dkt. No. 61).  Notwithstanding this discussion, no further efforts were made to serve either defendant Barber or defendant Wiggins.  The time for service has long passed, even utilizing the 120 day limit in the former Rule 4(m), and excluding the time that the case was stayed based upon plaintiff's mental health problems.[26]

This court will recommend dismissal as against defendant Barber without prejudice.  Although plaintiff must be given notice of such dismissal, this recommendation will afford him the notice required.  He may include his explanation

---

[25] After the amended complaint was filed, the action was stayed from September 21, 2016 (Dkt. No. 48) until January 23, 2017 (Dkt. No. 53) due to plaintiff's mental health issues.  It is probable that plaintiff never sent the appropriate documents to the Clerk so that defendant Wiggins could be served.

[26] The 120 days for service would have ended on February 4, 2016, long before the case was stayed on September 21, 2016.  The court notes that, although the Marshal is responsible for service of the complaint/amended complaint, the plaintiff must give the Clerk the appropriate information to identify and locate the defendant.  The court also understands that pro se plaintiffs often have difficulty in this regard, but if so, must exercise due diligence in asking for assistance from the defendants in discovery.  If the defendants are not forthcoming, plaintiff may request limited assistance from the court.

31

for his failure to serve this defendant in any objections he may file to this Report and Recommendation.  Plaintiff may attempt to establish good cause for his failure to follow up on the failure of the Marshal to serve defendant Barber.  With respect to defendants Wiggins and Sypolt, the court is recommending dismissal with prejudice because plaintiff has failed to state any claim against them, and serving these defendants at this time would be futile.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the motion for partial summary judgment (Dkt. No. 66) filed on behalf of defendants **Siriano, Rugari**, and **Dougherty** be **GRANTED** for the reasons stated above, and it is

**RECOMMENDED**, that the amended complaint be dismissed sua sponte **WITHOUT PREJUDICE FOR FAILURE TO SERVE** as against defendant Barber, and it is

**RECOMMENDED**, that the amended complaint be dismissed as against defendant **RUGARI only with respect to the failure to protect claim**,[27] and it is

**RECOMMENDED**, that the amended complaint be dismissed sua sponte **WITH PREJUDICE FOR FAILURE TO STATE A CLAIM AND FOR FAILURE TO SERVE** as against defendants **WIGGINS and SYPOLT**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk

---

[27] Plaintiff's claim for excessive force on October 13, 2011 against defendants Rugari and Murphy will proceed.

of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: August 22, 2017

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**